IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 26, 2011 Session

## DAVID LARKIN WALL v. AMY BALLESTEROS WALL

An Appeal from the Chancery Court for Shelby County
No. CH-06-01278-3     Kenny W. Armstrong, Chancellor

No. W2010-01069-COA-R3-CV - Filed July 14, 2011

This is a post-divorce petition to modify a parenting plan. In the divorce decree, the mother was designated as the primary residential parent of the parties' daughter. Two years later, the father filed this petition to modify the decree to designate him as the primary residential parent, alleging that the mother had inadequate child care arrangements while the mother was at work, and that the mother had not been adequately caring for the child's basic personal and educational needs. The parenting plan was temporarily modified to designate the father as the temporary primary residential parent. Nevertheless, the father was ordered to continue paying child support to the mother pending the trial, in order to maintain the *status quo*. After a hearing, the trial court found a material change in circumstances, but found it was not sufficient to change the designation of primary residential parent to the father on a permanent basis. The father was awarded substantially more parenting time. The father now appeals the denial of his petition to change the designation of primary residential parent and the award of child support to the Mother while he was the temporary primary residential parent. We affirm the award of child support, but reverse the denial of the petition to change the designation of the primary residential parent based on the mother's consistently poor judgment in decisions related to the care of the child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is
Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Rachel Emily Putnam, Memphis, Tennessee, for the Petitioner/Appellant David Larkin Wall.

Amy Balesteros Wall, Collierville, Tennessee, Respondent/Appellee, *Pro Se*.[1]

**OPINION**

**FACTS AND PROCEEDINGS BELOW**

Petitioner/Appellant David Larkin Wall ("Father") and Respondent/Appellee Amy Ballesteros Wall ("Mother") were married in October 2000. At the time of their marriage, Mother had a son from her previous marriage, Kagen ("Kagen"), born November 28, 1996. Kagen lived with Mother and Father after they were married. The parties had one child during the marriage, Katelyn Alexis Wall ("Katelyn" or "the child"), born October 18, 2001.

During the marriage, the parties lived in Collierville, Tennessee. Father was employed as a pilot for Federal Express, and Mother was an apartment manager. Shortly before the divorce proceedings were initiated, Mother quit her job and obtained a license to sell real estate.

In June 2006, Mother and Father traveled to Anchorage, Alaska to visit Father's family. While there, Father and Mother became engaged in a physical altercation. Shortly after that, the parties separated. A few weeks later, Father filed a petition for divorce in the Chancery Court of Shelby County, Tennessee, alleging inappropriate marital conduct and irreconcilable differences. During the separation, Father stayed in the marital home and accepted all of the debt on the home. Mother moved into a nearby apartment with the children. At the time divorce proceedings were initiated, both parties were thirty years old.

In November 2006, the parties executed a marital dissolution agreement ("MDA"). The MDA incorporated an agreed permanent parenting plan ("2006 PPP") for Katelyn, which designated Mother as the primary residential parent, allocated Father eighty days of parenting time, and gave the parties joint decision-making authority as to all major decisions.[2] The parenting plan stated that Father earned a gross income of $7,114 per month. At the time the parties agreed on the MDA, Mother had obtained her real estate license but had not yet begun working; nevertheless, the 2006 PPP imputed to her a gross income of $1,866 per month. Based on these agreed income levels in the 2006 PPP, Father agreed to pay Mother $1,100 per month in child support, an upward deviation from the amount required under the child

---

[1]Mother was represented by counsel in the trial proceedings. In this appeal, she represented herself.

[2]The 2006 PPP included a provision whereby Mother agreed "not to relocate to a residence more than 65 miles from her present residence for a period of three years."

support guidelines.[3] On December 5, 2006, the parties were divorced by final decree, and the decree incorporated the MDA and the 2006 PPP.

After the final decree of divorce was entered, Mother discontinued her pursuit of a career in real estate. She became a dental assistant, and Katelyn, five years old at the time, was placed in daycare while Mother was at work, apparently during regular daytime business hours.[4]

In the August 2007, Katelyn started kindergarten at Sycamore Elementary School in Collierville, Tennessee. Over the course of the fall semester, Mother assured Father that Katelyn was doing well in school. In the Spring of 2008, Father visited Sycamore Elementary to have lunch with Katelyn. During the visit, Katelyn's teacher, Ms. Martin, approached Father and told him that Katelyn had been coming to school improperly dressed, and that she had not brought snacks to school on her assigned snack day all year. Ms. Martin indicated to Father that she had not received any response from a parent to any of the notes sent home in Katelyn's backpack. This information from Ms. Martin caused Father to become concerned about Mother's care of Katelyn.

Around this same time, Mother left her job as a dental assistant and took a job in the administrative office of the Transportation Security Administration ("TSA"). For the first few weeks, Mother was in training for the TSA job, working 9:00 a.m. to 5:00 p.m. each weekday. In approximately May 2008, Mother completed her TSA training and began working in a permanent position. Initially, Mother worked a shift that began at 4:00 a.m. and ended at 12:30 p.m. In June 2008, Mother changed her work schedule to a shift that began at 6:00 a.m. and ended at 2:30 p.m.

In the wake of these developments, later in the Spring of 2008, Father called Mother to ask about her childcare arrangements for Katelyn for the coming summer. In the conversation, Father offered to find a babysitter for the child while Mother was at work. Mother refused and told Father that she planned to have neighbors in her apartment complex help her with both Katelyn and Kagen. Mother named Carrie Wilkinson ("Carrie"), who lived in the apartment directly above Mother, as one of the neighbors who would provide child care.

---

[3] According to the worksheet attached to the 2006 PPP, under the child support guidelines in effect at the time, Father would have owed Mother $852 per month in child support.

[4] In March 2007, Mother sent written notice to Father that she intended to relocate with the child to Florida, where some members of Mother's family lived. Father filed a petition in the trial court objecting to Mother's relocation with the child, noting that Mother's request was in contradiction of the specific provision about relocation in the parties' 2006 PPP. For reasons that are unclear in the record, Mother did not relocate to Florida. There is no order in the record adjudicating Mother's petition to relocate, but it was apparently abandoned.

Carrie's son Will was Kagen's age and friends with Kagen. When Father asked Mother for details about Carrie or the specific arrangements, Mother refused to give him any more information and told Father she did not want him involved in her personal affairs.

After that conversation, it turned out that, during the Summer of 2008, Mother was leaving for work with Katelyn and Kagen alone in the apartment, while babysitter/friend Carrie remained upstairs with her own children. Katelyn and Kagen were instructed by Mother to either go to Carrie's apartment when they woke up or stay by themselves in Mother's apartment and call Carrie if they needed anything.

Apparently, during the parties' marriage, each summer Katelyn had an extended visit in Alaska at the home of her paternal grandmother. In the Summer of 2007, both Kagen and Katelyn went on the Alaska trip. In June 2008, Katelyn flew by herself to Alaska to visit her paternal grandmother for four weeks. Mother wanted Kagen to go with Katelyn on this trip again, but Father told Mother that he only had enough flight credits for an airline ticket for Katelyn. Mother initially objected, but ultimately permitted Katelyn to go to Alaska without Kagen.

At some point during this time, Father became engaged to Rachel Hodges ("Stepmother"). They were scheduled to marry in October 2008.

Meanwhile, Katelyn was scheduled to begin the first grade in August 2008. On August 10, 2008, the day before school began, Father called Mother to ask about the child care arrangements for Katelyn before and after school. Stepmother was also a party to the series of telephone conversations that took place on that day. Unbeknownst to Mother, Father recorded the telephone conversations and a transcript of them is in the appellate record. In the conversation, Father noted that, to get to work on time, Mother had to leave her apartment around 5:15 a.m. Apparently Kagen's middle school bus arrived at the designated bus stop at approximately 7:35 a.m. on school mornings, and Katelyn's school bus arrived about forty-five minutes later. Father wanted to know Mother's arrangements for Katelyn's care for these time periods, namely, after Mother left to go to work, and during the time between when Kagen's bus picked him up for middle school and the time that Katelyn's bus picked her up about forty-five minutes later. Mother responded angrily to Father's inquiry, repeatedly claiming that Father was trying to pry into her personal business and adamantly refusing to respond to his questions about Katelyn's care. Stepmother attempted to mediate, but had little success. Ultimately, Mother indicated that Katelyn would be with Kagen in their apartment until Kagen left, and after that Katelyn would be with an unidentified "friend." Mother specifically refused to identify the "friend," even when told that Katelyn had expressed concern to Father.

-4-

Three days later, Mother called Father to apologize for her behavior and to tell him that, after Kagen left, Katelyn would be walking to her school bus with Will, Carrie's son, who was Kagen's age. Thus, after Mother left her apartment at 5:15 a.m., eleven-year-old Kagen was responsible for six-year-old Katelyn. When Kagen had to leave to meet his school bus, he was to take Katelyn to Carrie's apartment. Katelyn would then walk to the bus stop with Will. When Father started to ask Mother additional questions, she quickly said goodbye and hung up.

A few weeks into the school year, Katelyn's first-grade teacher, Ms. Bernero, contacted Father. Ms. Bernero told Father that she had made numerous attempts to reach Mother, to no avail. Ms. Bernero expressed concern because Katelyn was not completing her homework, and she told Father that Katelyn at times had no money in her lunch fund. The teacher indicated that Katelyn had a "D" in language arts. After his conversation with Katelyn's teacher, Father replenished Katelyn's lunch fund, became more involved in Katelyn's schoolwork, and maintained contact with the teacher. In light of all of these events, Father decided to ask the trial court to designate him as Katelyn's primary residential parent.

On September 4, 2008, Father filed the pleading that is the subject of this appeal, an Emergency Petition for Injunctive Relief and to Modify the Previous Order of the Court. The petition sought an immediate order from the trial court designating Father as the primary residential parent of Katelyn because: (1) Mother had begun to work an unusual work schedule, from 6:00 a.m. until 2:00 p.m.[5] on Thursday through Monday each week, with Tuesday and Wednesday off; (2) Mother had been leaving six-year-old Katelyn alone in the care of eleven-year-old Kagen when she was at work; (3) Mother refused to accept assistance from Father with child care while Mother was at work; and (4) Father was engaged to be married the following month to Stepmother. Father alleged that Mother failed to follow the 2006 PPP in that she failed to properly care for Katelyn; refused to provide Father relevant information regarding the persons caring for Katelyn in Mother's absence; failed to bathe, clothe, and feed Katelyn appropriately; did not assist Katelyn in completing her homework; refused to allow Father to assist Katelyn with her homework during his parenting time; interfered with Father's telephone visitation with Katelyn; and refused to allow Father to exercise his designated parenting time. Characterizing these as unforeseen changes in the parties' circumstances since the entry of the divorce decree, Father asserted that it was in the best interest of Katelyn to designate him as the primary residential parent and to grant Mother parenting time when she was off work. Mother filed a pleading opposing Father's petition, and discovery ensued.

_____

[5]Although the petition alleged that Mother worked from "2 a.m. to 2 p.m.," this was apparently a typographical error.

On February 6, 2009, the trial court entered a consent order appointing Lucie K. Brackin as the guardian ad litem ("GAL") for Katelyn. The order directed the GAL to conduct an investigation and to submit a report to the trial court that included conclusions and recommendations as to the best interest of the child.[6] Soon thereafter, the GAL retained a psychologist, Dr. Jane Clement ("Dr. Clement"), to provide counseling services to Katelyn. The child was also enrolled in speech therapy.

By March 12, 2009, Ms. Bernero wrote an email to Father to let him know that Katelyn had again run out of money in her lunch account. The email noted that Katelyn had "made vast improvements" in her schoolwork, in that Katelyn's language arts grade had gone from a "D" to a "B," and Ms. Bernero thanked Father for his help with this.

On March 17, 2009, the trial court set the matter for trial on May 5, 2009. Also on that date, in accordance with the recommendation of the GAL, the trial court entered an order allocating additional parenting time to Father from Tuesday after school through Wednesday at 8:00 p.m., in addition to his regularly scheduled parenting time.

The trial was not held on May 5, 2009, as scheduled. Instead, on May 20, 2009, the trial court entered an order continuing the trial so that the parties could engage in mediation, and the trial was rescheduled to June 9, 2009. The order also required that, if Mother's parenting time occurred on a Saturday or Sunday when she was scheduled to work, Mother was to take the child to Father's home at 6:30 a.m. and pick her up at 4:00 p.m. In the same order, the trial court enjoined Mother from leaving Katelyn in the care of any minor, including Kagen, who by then was twelve years old.

The parties participated in mediation as scheduled and reached an oral agreement on several issues. Father's counsel reduced the parties' agreement to writing, but Mother's attorney never responded, and the written agreement was never executed.

On June 9, 2009, the parties appeared in court ready to proceed with trial.[7] Due to the trial court's docket, however, the matter was again continued until July 30, 2009. In lieu of trying the case on that date, the parties engaged in a lengthy settlement conference. Again, an

---

[6]The consent order indicated specifically that the parties waived any hearsay objections to the testimony of the GAL on conversations with relevant persons such as teachers, and agreed that the GAL would be deemed an expert for purposes of giving opinion testimony and recommendations. *See Andrews v. Andrews*, No. W2009-00161-COA-R3-CV, 2010 WL 3398826, at *3-4 (Tenn. Ct. App. Aug. 31, 2010); TENN. SUP. CT. RULES 40A (2010).

[7]A transcript of that hearing is not included in the appellate record.

agreement was reached on several issues,[8] but after the parties' oral agreement was reduced to writing, Mother refused to sign the written agreement.

On June 12, 2009, Father filed an Emergency Motion For Entry of Summer Parenting Schedule, asserting that the parties could not agree on a summer parenting schedule, and no summer parenting schedule was in place. Father asked the trial court to set a schedule in accordance with the recommendation of Katelyn's psychologist, Dr. Clement. In support of his motion, Father submitted Dr. Clement's affidavit, in which she said that Katelyn's best interest "would be served by immediately designating Father as the Temporary Primary Residential Parent during this summer break and pending the trial of this matter." Dr. Clement recommended Mother's parenting time be scheduled for times in which Mother was not working. Dr. Clement's affidavit indicated that her recommended arrangement was necessary because "Katelyn is in dire need of continuity in her day to day life and should not be caused to go back and forth between Mother and Father's house multiple times every week in order to accommodate Mother's work schedule which has changed multipl[e] times over the past two months."

An evidentiary hearing was conducted on Father's motion.[9] The GAL apparently testified before the trial court in a manner consistent with the opinion of Dr. Clement.[10] Thereafter, on June 16, 2009, the trial court entered an order temporarily modifying the parties' parenting plan. The order designated Father as the temporary primary residential parent pending the July 30, 2009 trial, and granted Mother parenting time on days that she was not working.

On June 19, 2009, Mother's counsel was permitted to withdraw from the case. The trial was eventually reset for August 5, 2009.

While Father was the temporary primary residential parent for Katelyn, Mother sought overtime work at the TSA. At some point, Mother also obtained a job at a gas station, working a twelve-hour shift from 5:00 or 5:30 a.m. until 5:00 p.m. one or two days a week. The gas station was owned by her boyfriend at that time, Aman Devji ("Aman").

---

[8]Father's brief describes the circumstances surrounding the events on June 9, 2011. Many of his statements of fact, however, are not documented in the appellate record. In this appeal, we may consider only those facts that are supported by the evidence and other documentation in the record.

[9]A transcript of that hearing is not included in the appellate record.

[10]The trial court indicated in its order that, in ruling on Father's motion, it considered the "testimony of the Guardian ad Litem."

On August 5, 2009, the scheduled trial date, Father, his counsel and witnesses, the GAL, and Dr. Clement appeared for trial. Mother also appeared, but she had not secured substitute counsel and thus was unrepresented.[11] The trial court decided to hold an in-chambers conference with Mother, counsel for Father, and the GAL.[12] In the conference, counsel for Father, the GAL, and Dr. Clement presented to the trial court a proposed modified permanent parenting plan which designated Father as the permanent primary residential parent and gave Mother eighty-two days of parenting time, basically maintaining the *status quo* as reflected in the June 16, 2009 order. Mother argued that the original parenting plan should not be altered, but she did not propose her own parenting plan.

The trial court declined to adopt a final permanent parenting plan on that day. Instead, it reset the trial date another sixty days, to give Mother further opportunity to obtain counsel. It adopted the modified parenting plan proposed by Father, with minor changes, as the temporary parenting plan pending the trial. The trial court indicated that the trial would proceed on October 7, 2009, regardless of whether Mother had obtained counsel by that time.

Acting *sua sponte*, the trial court also included a special provision in the temporary parenting plan that required Father to pay Mother $750 per month in "temporary child support" for the months of August and September, even though Father remained the temporary primary residential parent. The trial court acknowledged that, under a straight application of the child support guidelines, Mother would be required to pay Father $205 per month in child support, based on Father's gross income of $10,500 per month and Mother's gross income of $2,400 per month, but it found that "a temporary upward deviation is appropriate in order to allow Mother time to adjust her finances." The order indicated that the parties' final child support obligations would be determined prior to October 1, 2009. This arrangement remained in effect until the issue was revisited in October 2009.

Meanwhile, in August 2009, Katelyn began the second grade at Crosswind Elementary, also in Collierville, in Father's school district. Katelyn made excellent grades in all of her classes.

In September 2009, Mother's new trial counsel entered an appearance in the trial court. Not long after that, Mother filed a motion in limine to preclude psychologist Dr. Clement from testifying as an expert at trial, because she did not conduct either a forensic child custody

---

[11]On July 23, 2009, the trial court entered an order appointing counsel for Mother, based on her affidavit of indigency and in order to defend her against two motions for civil and criminal contempt that had been filed by Father. Thereafter, Father agreed to dismiss the pending motions for civil and criminal contempt, and the trial court relieved Mother's court-appointed counsel from her duties. As a result, Mother was again unrepresented by counsel.

[12]The appellate record does not contain a transcript of the in-chambers proceeding.

evaluation or a parental access evaluation in this case. Eventually, the trial court entered an order which precluded Dr. Clement from testifying as an expert witness, but permitted her to testify as a fact witness, as Katelyn's treating psychologist. Based on the prior consent order on the GAL, the trial court rejected Mother's motion to preclude the GAL from testifying as an expert witness at trial.

On October 6, 2009, on the eve of the scheduled trial, counsel for all parties and the GAL appeared before the trial court to discuss the issues to be decided at trial. Father argued to the trial court that the only issues to be decided at the trial were the attorney fees and the fees of the GAL, while Mother maintained that all issues related to Father's petition for custody were still pending. The trial court agreed with Mother and permitted the trial to proceed on all issues related to custody. *Sua sponte*, the trial court ordered Father to continue to pay Mother $750 per month in child support pending the trial. The trial court continued the trial to December 11, 2009.

A few days after that order was entered, Father filed a "Motion to Reconsider Court's *Sua Sponte* Ruling on Child Support." He argued that the trial court erred in deviating from the amount of child support due under the child support guidelines without making a specific finding, based on evidence, that such a deviation was necessary for the child. Father noted that Katelyn was in his care twenty-two days out of each month, that he had incurred attorney fees, expert fees, and GAL fees during the litigation to protect Katelyn's interests, and that consequently he did not have the ability to pay Mother $750 per month. Father also noted that his infant son, born on October 7, 2009, must be considered in calculating the parties' child support obligations.

On November 12, 2009, the trial court held an evidentiary hearing on the issue of Father's temporary child support obligation.[13] The purpose of the hearing, the trial court stated, was to allow Father to put on proof that he did not have the ability to pay the child support ordered, commenting that, "if he doesn't [have the ability to pay], I'll take a look at it. . . . But I can't imagine he doesn't have the ability to pay 750 a month." Father and Mother each testified at the hearing as to their income, expenses, and other financial issues. Father testified, without dispute, that Katelyn was in his care a majority of the time, and that he paid all of her expenses. Mother testified that she needed the child support from Father in order to meet her monthly expenses.

At the conclusion of the hearing, the trial court orally denied Father's motion, finding that it was appropriate to "maintain the *status quo* until we have a hearing in December. Based on my review of the evidence, I think Mr. Wall can well afford to pay the 750 a month that

_____

[13]A transcript of the hearing and exhibits from this hearing were filed with the appellate record.

was ordered by the court." The trial court also found that Mother was not paying an excessive amount for her three-bedroom apartment. The trial court entered a written order extending Father's $750 per month child support obligation through the date of the trial, scheduled for December 11, 2009.

A couple of weeks later, Father filed a motion seeking a continuance of the scheduled trial because Dr. Clement had a scheduling conflict that would not allow her to be present at trial. The trial was reset for January 25, 2010, and Father's $750 per month temporary child support obligation was extended through the January 2010 trial date.

On January 15, 2010, Father filed a petition for injunctive relief against Mother. Based on Katelyn's statements to Father and to Dr. Clement indicating that Mother had permitted a male friend to spend the night in her apartment while Katelyn was present, and that Mother had taken Katelyn to spend the night at the home of her boyfriend, Aman, on a school night, Father requested an order enjoining Mother from such activities. Father also requested a reduction in his child support obligation. In addition, Father filed a petition for civil and criminal contempt against Mother, alleging that she continued to talk to Katelyn about the ongoing litigation, despite the prohibition against doing so, and alleging further that Mother was still leaving Katelyn in the care of twelve-year-old Kagen.[14] On January 25, 2010, the trial court entered a consent order, ordering Mother to refrain from having adult overnight guests of the opposite sex during her parenting time, and prohibiting Mother from having Katelyn away from Mother's home after her normal bedtime on a school night.

On January 25, 26, 27, and 28, 2010, the trial court conducted a trial on Father's petition. The primary testimony presented came from the GAL, Dr. Clement, Father, and Mother.[15]

The trial court heard first from the GAL. Although the GAL was assigned to the case in January 2009, she summarized the background and history leading up to the petition from her review of the pertinent documents, emails, affidavits and pleadings, and from talking to

---

[14]This is the same conduct upon which Father's first two petitions for contempt were based.

[15]The trial court also heard testimony from a private investigator hired by Father to observe the entrance to Mother's apartment and Katelyn's path to the school bus stop in the early morning hours on a school morning. The investigator arrived at approximately 4:00 a.m. on a school morning and observed Mother enter her apartment at approximately 5:40 a.m. Kagen left the apartment to walk to his school bus stop at approximately 7:30 a.m. At approximately 8:15 a.m., Katelyn walked to the apartment above Mother's, and then shortly after that walked to the school bus stop with several young children. In her testimony, Mother explained that, between 4:00 a.m. and 5:40 a.m, she was near the apartment out of sight of the investigator, sitting by herself on the back steps, praying. She denied that she had been at the apartment of her male friend Nawaz, in the same apartment complex.

the parties, Dr. Clement, and Katelyn. The GAL related events and occurrences that were cause for concern.

The GAL recounted that, when Katelyn was in kindergarten in the 2007-08 school year, the teacher contacted Father to tell him that she could not reach Mother, and that notes sent home and telephone messages went unanswered, and the teacher's concerns that Katelyn was not completing her homework, was not bringing papers signed by a parent back to school, and was at times improperly dressed. The GAL noted that the school's grading scale for kindergarten awarded grades of "M" for "mastery" and "X" for non-mastery, and that Katelyn had "quite a few" Xs.

The GAL stated that she learned that, in the summer of 2008, Mother chose to leave Katelyn, then six years old, to be babysat all day by eleven-year-old Kagen when she was at work. This occurred despite the fact that Father had offered to pay for summer child care. The GAL said that Mother saw no problem with this, relying on the fact that her friend Carrie lived in the apartment just above Mother and was available if needed.

The GAL testified that a similar situation occurred when Katelyn began first grade in August 2008, when Katelyn's first grade teacher contacted Father because she was concerned about Katelyn and could not reach Mother. Katelyn's homework papers showed she had been making Fs and Ds. After this, the GAL stated, Father began working with Katelyn on her homework during his parenting time, and he was in constant communication with the first grade teacher. Mother's response was less than helpful; she refused Father's request to send Katelyn's book bag to his home with Katelyn, and the GAL's conversations with the first grade teacher and Dr. Clement indicated that Katelyn was not made to study while at Mother's home. In the first semester of first grade, Katelyn had earned a "D" in language arts, but after Father's intervention, Katelyn's grades improved significantly.

The GAL also expressed concern about Katelyn's early morning child care during this time. She testified that it was apparent that Kagen was responsible for caring for Katelyn and getting her ready for school in the mornings, because Mother had to be at work before 5:00 a.m. The GAL said that Mother at times would wake Katelyn at 4:15 a.m. and take her to Carrie's apartment upstairs before she went to work, and Katelyn would walk to the bus stop with Carrie's son, Will. As occurred when Katelyn was in kindergarten, the first grade teacher reported that Katelyn came to school with hair that was messy, clothes were too small, and a generally unkempt appearance. The GAL related that, in her January 2009 conversations with Katelyn, Katelyn told her that she did not like waking up early in the mornings, and even when she went to Carrie's apartment in the early morning, Carrie's son Will, instead of Carrie, would be responsible for getting her ready for school, feeding her breakfast, and taking her to the bus stop, because Carrie was asleep.

The GAL also expressed concern about Mother's after-school child care arrangements for Katelyn when Mother was at work. Mother made no arrangement for an adult to meet Katelyn's elementary school bus after school. Instead, Mother instructed Katelyn that, when she got off her school bus, she was to walk to Carrie's apartment. If Carrie was not home, Katelyn was told to go to the apartment of another neighbor named Melissa. If Melissa was not home, the child was instructed to walk to a third person's apartment whose name the GAL could not remember. As the GAL described the arrangement, Katelyn was essentially left to go "door to door until she found someone to care for her." On one occasion, the GAL said, Father arrived at Mother's apartment to pick up Katelyn for his parenting time in the afternoon or early evening, and Mother did not know where Katelyn was.

The GAL testified that, sometime in the Fall of 2008, Father signed a form sent home from school allowing Katelyn to undergo a speech therapy evaluation, pursuant to her teacher's recommendation. Mother crossed out Father's name on the form, and a meeting about this issue was scheduled at the school at a time chosen by Mother so that she could attend. Despite all of this, Father appeared at the scheduled meeting, but Mother did not. In January 2009, Katelyn began the recommended speech therapy.

The GAL also relayed an incident that caused her to be concerned about Mother's conduct in Katelyn's presence. Specifically, the GAL reviewed a tape of a telephone conversation between Mother and Father about an incident in February 2009 that occurred when Father dropped Katelyn at Mother's home after his parenting time. Father was supposed to drop Katelyn off at 8:00 p.m., and he arrived at Mother's apartment at 8:03 p.m. As was customary, he did not walk Katelyn to the door, but instead watched her from his vehicle. When Katelyn got to the apartment door and opened it, she signaled Father with a "thumbs-up," so Father left. It later turned out that Mother was not home at the appointed time,[16] so unbeknownst to Father, Katelyn went into Mother's empty apartment. The tape the GAL listened to was of an ensuing telephone conversation between Mother and Father, with Mother repeatedly angrily cursing and yelling at Father, berating him for not being certain she was home before Katelyn was dropped off. The GAL was concerned, regardless of the details of the incident that occurred, that Mother would engage in such cursing and berating Father in Katelyn's presence.[17]

_____

[16]Mother explained that she had been out with girlfriends and was late getting back to her apartment. She did not indicate that she called Father to tell him that she would be late. Mother denied that Katelyn gave Father a "thumbs-up" before Father started to leave.

[17]Mother testified that she came up to Father's vehicle as he was pulling away and knocked on his car window. She testified that she was upset in her taped telephone conversation because Katelyn was "too little to be left home alone." She said, "I did forget to lock my [apartment] door that day. Thank God she

(continued...)

The GAL indicated that, by March 2009, Katelyn's academic performance had improved, particularly in language arts. The GAL said that Katelyn's teacher attributed this to the speech therapy and to Father's efforts with the child.

In April 2009, the GAL received reports that Katelyn was arriving at school in dirty clothes and without having been bathed. The GAL reviewed photographs of Katelyn's clothes and underwear that she described as "pretty gross," indicating that the child was not cleaning herself after using the bathroom. The GAL also received reports from Father that Mother was not bathing Katelyn; he told the GAL that, when Katelyn was asked when was her last bath, she replied "when I was here," that is, Father's home, several days prior. As a consequence, Father implemented a routine whereby, when he had parenting time with Katelyn, she bathed before they started homework. The GAL reported that, when confronted about Katelyn's hygiene issues, Mother took action only after photographs were made available to her attorney.

The GAL testified that it became apparent to her that, despite the concerns expressed to her, Mother was continuing to leave Katelyn in the care of either Kagen or Carrie's son, Will, sometimes during her parenting time. The GAL also believed that Mother still did not help Katelyn with her homework in the evenings, but instead relied on Kagen to do so.[18] The GAL also noted that Mother had missed several of Katelyn's appointments with the psychologist, Dr. Clement.

The GAL testified that the problems with Mother persisted even after Father was designated the temporary primary residential parent in August 2009. After that change, the GAL said, Mother missed six or seven of her scheduled visits with Katelyn. In the Fall of 2009, the GAL learned, a male friend of Mother's spent the night in Mother's apartment; Mother, Katelyn, and the friend all slept on Mother's couch together. On another occasion, Mother, Katelyn, and Kagen all went to the home of Mother's boyfriend and spent the night there. Even though the GAL met with Mother after this incident to let her know that this conduct was not acceptable, the GAL discovered that, just a few weeks before trial, it happened again, this time on a school night.

---

[17](...continued)
[Katelyn] was at least able to get inside." Mother did not address the safety ramifications of leaving her apartment unlocked in her absence. Mother claimed she was not in the same room as Katelyn during the taped telephone conversation, and explained that she would "try to shut the door or go outside" before engaging in such a tirade.

[18]The record includes evidence indicating that Kagen's academic performance was poor.

The GAL explained to the trial court why she had changed her recommendation to the trial court from recommending that Mother remain the primary residential parent, to recommending that Father be designated the permanent primary residential parent. The GAL testified that, in her March 2009 report and recommendation, although the GAL felt that Mother's 2008 parenting had bordered on dependency and neglect, the situation had improved and the GAL believed that Mother had learned from her parenting mistakes and would continue to improve. Consequently, in March 2009, the GAL had recommended to the trial court that Mother remain Katelyn's primary residential parent. The GAL's recommendation was later changed to a recommendation that Father be designated the primary residential parent, because it had become apparent to the GAL that Mother had not in fact learned from her mistakes. The GAL had concluded that Mother was not reliable, and that she was sometimes untruthful. For example, Mother told the GAL that Kagen's grades were good, when in fact Kagen did very poorly in school and often had in-school suspensions. Mother denied withholding information about babysitters from Father, when in fact she had. Mother denied receiving text messages that the GAL believed that she had received. Generally, the GAL felt that she had "to double check" Mother's representations to her.

The GAL testified that the parenting schedule in place at the time of trial, with Father as the primary residential parent, was a good arrangement for Katelyn. The GAL said that Katelyn liked the schedule and that, under this schedule, Katelyn was "doing wonderfully" and was more comfortable and more confident. Katelyn's teachers indicated that she was thriving, and her grades, by the time of trial, were all As, with a high B in language arts. Katelyn indicated to the GAL that Stepmother helped her with her schoolwork, and commented to the GAL that Stepmother was "super good at doing homework with me." The GAL attributed the child's overall sense of well-being and success in school to Father and his efforts.

The GAL told the trial court that, in light of all of these facts, she felt that a substantial material change had occurred since the entry of the divorce decree, and that Father could not have foreseen that Mother would not properly care for the child's education, safety, and personal hygiene. She felt that the best interest of the child was served by keeping intact the arrangement in place at the time of trial, with Father as the primary residential parent and Mother exercising parenting time when she was not working.

Katelyn's psychologist, Dr. Clement, also testified at length.[19] Pursuant to the GAL's recommendation, Dr. Clement met with Katelyn for therapy sessions a few times every

---

[19]As noted above, Dr. Clement testified as a fact witness, not as an expert, so she did not make a recommendation to the trial court as to the parenting arrangement for Katelyn.

month from March 2009 until January 21, 2010. Sometimes the child was brought to the therapy sessions by Father and Stepmother, and sometimes by Mother.

Dr. Clement's testimony highlighted the contrast between Father and Mother, with respect to their cooperation with her admonitions as well as their focus on Katelyn. Dr. Clement said that she cautioned the parties not to discuss the litigation with Katelyn, because this increased the child's anxiety. Although Father appeared to adhere to this instruction, it appeared to Dr. Clement that Mother talked about the litigation with the child. Katelyn told Dr. Clement that Mother had said to Katelyn that Father was "going to take [her] away" and never let her see Mother. When Dr. Clement spoke to Father about Katelyn, Father was focused on the child. In contrast, on some therapy visits with Mother, Dr. Clement stated, Mother would focus on her own interactions with Father and the issues during their marriage. Dr. Clement had to attempt to refocus Mother's attention on Katelyn's interests.

Dr. Clement testified to the trial court from the notes from her sessions with Katelyn. In her first visits, Katelyn described the arrangement for mornings when Mother had to work, and told Dr. Clement that she did not like getting up in the dark and going to the neighbor's apartment early in the morning. Katelyn made similar comments to Dr. Clement through May 2009. Katelyn expressed having generalized, unspecific fears at Mother's apartment.

Dr. Clement indicated concern that Katelyn had been coached by Mother to make certain comments that were favorable to Mother, comments that contradicted Katelyn's earlier statements to Dr. Clement. For example, in one session Katelyn blurted out, "I like going to babysitters' houses." In another session, Katelyn said abruptly, "I don't mind getting up early in the dark."

In a May 2009 session, Dr. Clement testified that Katelyn was "thrilled" because school was over, she was going on vacation with Father and Stepmother, and she was excited about going to Alaska for four weeks in the summer to visit her paternal grandmother. In July 2009, while at her grandmother's house in Alaska, Katelyn attended a reading program which required her to read several books; when Dr. Clement called Katelyn to check on her, she said Katelyn was "ecstatic" about reading every day, swimming in ponds, camping, and playing with ducks. When she returned, Katelyn told Dr. Clement that Alaska was "the most fun place ever. . . . I can't wait until next summer." After Katelyn started her new school in Father's school district, Crosswind Elementary, she reported to Dr. Clement that she liked it. Overall, Dr. Clement said, she observed a gradual improvement in Katelyn's self confidence from March to September 2009.

That perception apparently changed in early September 2009; after that, Dr. Clement's sessions with Katelyn indicated that Katelyn see-sawed between being happy in some

sessions and anxious or troubled in others. In a September 10, 2009 session, Katelyn indicated to Dr. Clement that Mother was angry at her, and that Mother had told Katelyn that the parenting arrangement in place at that time was "not fair" and that Mother was "going to get me back with her more nights." Katelyn told Dr. Clement that she liked spending time with her mother and father, but she did not like spending time with babysitters, including Mother's friend, Carrie. Katelyn commented to Dr. Clement that Mother's male friend Nawaz was at their home much of the time, and Katelyn preferred to be home with just Mother and Kagen. At a later September session, Dr. Clement indicated that Katelyn felt good about school, she liked the children at her school, and all was well.

By October, however, Katelyn again appeared anxious in her session with Dr. Clement. Katelyn wished to Dr. Clement that Mother did not have to work on the weekends; she said that she liked being at Father's house but also wanted Mother. Katelyn said that Mother told her that she "want[ed] the courts to give her more time," and hoped to change her work schedule so she would not be so tired.

At a November 2009 session, Katelyn spoke excitedly about her new brother, the baby born to Father and Stepmother. Later in November, Katelyn told Dr. Clement that she and Mother spent the night at the home of Mother's boyfriend, Aman. On that occasion, Katelyn played a game by herself while Mother was outside talking with Aman most of the time. Katelyn "wish[ed] Mom would play games with her," a desire that Dr. Clement said Katelyn often expressed.

Dr. Clement testified that, at a December 2009 session, Katelyn said proudly that she had made "the best grade ever in reading" and talked happily about her new baby brother. Katelyn then told Dr. Clement that, during her weekend with Mother, another male friend of Mother's, Rumon, spent the night with them at Mother's apartment. Mother explained to Katelyn that Rumon had locked himself out of his apartment. Katelyn described spending the night with Mother and Rumon, all three of them on the couch. When asked why she did not sleep in her own bed, Katelyn explained that it was because her room was too messy and there were too many things on her bed.

At a subsequent December session, Katelyn was doing well. She was excited about an upcoming Christmas party at Father's home, and she was also excited about a planned trip to Florida with Mother to visit Mother's family. Father and Stepmother had taken Katelyn to buy Mother a Christmas gift that Katelyn picked out herself. At that session, Dr. Clement reported, Katelyn had "no anxiety at all."

By early January 2010, the situation had once again changed. In a session on January 6, 2010, Katelyn told Dr. Clement that she, Kagen, and Mother again spent the night with

Mother's male friend, Aman, this time on a Monday night. Katelyn described to Dr. Clement that she and Kagen "had to get up [at Aman's home] at 3:00 a.m. and [Mother] woke us up and then she took us home. And she put us to bed, and we went to sleep until . . . we got up for school." Katelyn told Dr. Clement that she disliked staying at Aman's house because she did not get to spend time with Mother, and she had to get up even earlier in the morning.

Dr. Clement's final session with Katelyn prior to trial was on January 21, 2010, a few days before trial. In that session, Dr. Clement said, Katelyn's demeanor was uncharacteristic of her, clearly less comfortable and more anxious. Dr. Clement said that Katelyn wore a "fake smile," and stated in response to questioning, "everything is good," or "everything is fine." In a manner that was not responsive to the question Dr. Clement asked, Katelyn said, "Mom studies with me and never gets mad at me." Dr. Clement felt that Katelyn's statements had been rehearsed; that she was saying things she thought she should say, but did not really mean.

Father and Mother both testified at length during the trial. As set forth below, Mother's testimony conflicted with Father's testimony on many of the events leading up to Father's petition and during its pendency.

Father and Mother agreed that they had a fairly cooperative working relationship for the first few months after their divorce. They agreed that, although Kagen is not Father's biological child, Father had developed a relationship with Kagen, so he initially took both Katelyn and Kagen during his parenting time. Beyond those two points, the depiction of events by Father and Mother diverge. Father said that immediately after the divorce, he exercised more parenting time than was set forth in the 2006 PPP, because he picked the children up for a few hours almost every afternoon. According to Mother, before Father filed his petition to modify the parenting plan, he had virtually no involvement in the children's lives outside of his scheduled parenting time.

Father testified about the events during 2007-2008, when Katelyn was in kindergarten. He said that Mother assured him that Katelyn was doing well in school; Father did not see her report card. He recalled becoming concerned when Katelyn's kindergarten teacher contacted him in April 2008 to tell him that she could not reach Mother, that several notes sent home with Katelyn were unanswered, including notices about parent/teacher conferences, that Katelyn was not appropriately dressed at school, that her clothes were sometimes not clean, that she had problems counting and telling time, and that she was precluded from snack time because Mother had not sent snacks on Katelyn's snack day for the entire school year.

Mother told a different story. She claimed that she forgot to send snacks with Katelyn only once, and that she promptly called the kindergarten teacher, apologized to her, and sent in

an extra set of snacks to make up for it. When asked about the report that Katelyn's kindergarten teacher could not reach her, Mother said that school personnel had always been able to contact her, and that perhaps the teacher had a wrong number for her. Mother dismissed the report that she did not keep Katelyn properly fed and clothed as "crazy."

Father testified that, for the Summer of 2008, he offered to provide Mother a babysitter and a tutor for Katelyn, but that Mother refused his offer. Father began to suspect that Mother was leaving Katelyn alone with Kagen all day while she was at work, because when he picked Katelyn up in the afternoons, Katelyn was usually in Mother's apartment with Kagen and no adult.

Mother also described her child care arrangements for the Summer of 2008 when Katelyn was not in Alaska. Mother insisted that her neighbor Carrie was responsible for Katelyn while Mother was at work. Mother left for work in the wee hours of the morning, leaving Katelyn and Kagen in Mother's apartment, asleep. Mother explained that she "didn't want to wake them up." When Kagen and Katelyn woke up, she said, "they would basically get up and then go upstairs" to Carrie's apartment. Mother said that Carrie's husband left for his job very early, and "lots of times" Carrie would wake up when her husband left, but other times Carrie would remain asleep. Mother conceded that this was "not the best arrangement I could have made," commenting that perhaps she should have taken the children upstairs to Carrie's apartment before she left for work. She stated that another neighbor, Melissa, helped care for the children when Carrie was not available. Mother emphasized that Katelyn was never hurt, injured, or harmed while she was at work. Mother remembered Father offering to provide child care, but did not recall refusing Father's offer to provide tutoring.

The parties testified about the recorded August 10, 2008 telephone conversation in which Mother refused to give Father the name of the adult who would be caring for Katelyn during the school year. The transcript reveals that Father repeatedly asked Mother about the child care arrangements for Katelyn before and after school, and specifically asked for the name of the adult who would be responsible for Katelyn. Mother adamantly refused to answer his questions, cursed him, and characterized his questions as an attempt to invade her private life. In the telephone call, Mother insisted that eleven-year-old Kagen was "old enough to baby sit" six-year-old Katelyn. At trial, Mother acknowledged that she "should have just told" Father what he wanted to know, but asserted that he already knew that Carrie "has been my primary babysitter." Mother claimed that she provided Father with the telephone numbers for Carrie and Melissa.

Father testified that, in the beginning of Katelyn's first-grade school year, he asked Mother to send Katelyn's backpack with Katelyn for his scheduled parenting time, so that he could assist Katelyn with her homework, but that Mother refused. According to Mother, she

refused to send the backpack with Katelyn only one time; purportedly this was because Stepmother had made Katelyn cry during homework time.

The parties also testified about Katelyn's hygiene. Father said that, typically, Katelyn's clothes were abnormally dirty when he picked her up in the afternoons. As a result, he said that he began a routine whereby when he picked up Katelyn after school or in the evenings, he would have her bathe and eat before doing homework, and he would wash her clothes. Father stated that he began photographing Katelyn's clothing, including her underwear, in order to show the GAL what he was observing.

Mother adamantly denied that she neglected to either bathe Katelyn or wash her clothes. She explained that Katelyn's toiletry problems occurred because Katelyn would rush out of the bathroom to play. Mother claimed that the child's hygiene problems were resolved. Mother conceded that since Father's petition was filed, he had been working hard with Katelyn on her schoolwork, and she said that she welcomed Father's assistance. However, she claimed that when she was Katelyn's primary residential parent, she also worked with Katelyn on her homework every night that she had parenting time.

Father indicated that, at the time of trial, Katelyn was doing wonderfully in school at the school in his district, Crosswind Elementary. He described her as "giddy" and said that she was a "straight A student." He felt that the trial court's decision to designate him as the temporary primary residential parent had allowed him to help her achieve this success. Mother agreed that Katelyn was doing well but did not attribute it to Father. She pointed out that Katelyn's grades had improved by March 2008, before Father was granted more parenting time.

Mother asserted that Father has violent tendencies, and she testified about their June 2006 physical altercation in Alaska just prior to separation. Mother claimed that, on that occasion, Father placed her on her back and intentionally kneed her in the face, injuring her mouth. Mother maintained that, during their marriage, she frequently wore long-sleeved shirts to hide bruises caused by Father. She conceded that Father had never physically abused Katelyn, but claimed that he had once left bruises on Kagen's bottom. Mother asserted that Father was overly controlling, but was fine "in small doses" with Katelyn, so she did not worry about him within those parameters.[20]

Father also testified about the altercation in Alaska prior to the parties' separation. Father denied intentionally causing the injury to Mother's mouth. He said that, in the course of an argument, Mother began destroying family heirlooms of sentimental value to him and his

---

[20]No evidence was introduced to show that Father ever abused Katelyn.

family that were in a curio cabinet. He said that he tackled her to stop her, and when he did so, Mother fell to the floor and injured her mouth. Other than this single incident, Father said, he never physically harmed Mother.

Mother denied that she ever left Katelyn alone at any time. She admitted that she had left Katelyn alone with Kagen, but she saw no problem with this, and she pointed to instances in the parties' marriage in which Father left Katelyn alone with Kagen "for short periods of time." Mother denied discussing the ongoing litigation with Katelyn, but suggested that Katelyn may have overheard her speaking about it to someone else on the telephone. Mother also denied coaching the child about what to say to Dr. Clement during therapy sessions.

Mother acknowledged there were two occasions on which she and the children went to the home of her boyfriend, Aman, in the evening and they "end[ed] up staying the night." Mother admitted that she should have waited until Father's parenting time with Katelyn to spend the night with Aman away from her house. She maintained that Katelyn was comfortable with all of her male friends, Nawaz, Rumon, and Aman, saying, "She [Katelyn] loves them all. She really likes them."

On January 28, 2010, the last day of trial, Mother submitted to the trial court a new proposed modified permanent parenting plan that set forth an alternative arrangement in the event that the trial court found a material change in circumstances. In Mother's new proposed plan, Mother was designated as Katelyn's primary residential parent, but Father was allocated 156 days of parenting time, substantially more than was provided in the original 2006 PPP. The modified parenting plan proposed by Mother also provided that Father would parent the child on the weekends when she was scheduled to work.

At the conclusion of the testimony, the trial court issued a partial oral ruling. Initially, the trial judge told Mother's attorney that he was concerned that Mother was not "sufficiently engaged and focused frankly on the best interests of her daughter. . . . [T]here are no perfect parents and . . . we all make mistakes in raising our children, but I'm really concerned about her." Overall, the trial judge observed, the evidence "comes close," but the trial court held that the evidence did not establish a material change of circumstances that warranted a change in the 2006 PPP, commenting that changing the primary residential parent was "perhaps . . . too drastic of a measure to take." The trial court went on, however, to rule that "the proof does support some change in this case," stating that it wanted "to give [Father] more time during the week . . . ." At that juncture, the trial court instructed the parties to attempt to work out a mutually agreeable arrangement under which Mother was the primary residential parent but Father was given more parenting time. The parties were told to report back to the trial court after attempting to reach an agreement.

On February 5, 2010, Father filed a motion to alter or amend the trial court's oral ruling and/or for relief from judgment. He asserted that the trial court erred in failing to consider the positive change in circumstances that had occurred in Katelyn's life as a result of her having lived with Father since June 2009 under the temporary parenting schedule. In the interest of Katelyn's stability and continuity of care, Father argued that he should remain the primary residential parent. Otherwise, Father argued, Katelyn would be returned to the disorder and chaos at Mother's home.

On February 19, 2010, Father filed a "Motion for Court to Hear Preference of Minor Child Pursuant to T.C.A. § 36-6-106(a)(7)." Father argued that the prospect of being required to live primarily with Mother had created in Katelyn, then eight years old, severe anxiety, fear, and emotional distress. In support of his motion, Father attached an email from Katelyn's psychologist, Dr. Clement, addressed to both Mother and Father. Dr. Clement stated in her email that she had met with Katelyn twice since the trial court issued its oral ruling. Upon hearing that the trial court had ruled that she would be spending the majority of her time at Mother's home, Dr. Clement said, Katelyn sobbed and said that she wanted to be with Mother only when Mother was not working, and that she wanted the arrangement to remain the same as it was at the time of the trial. Dr. Clement felt that the trial court should consider Katelyn's concerns in making its decision on Father's motion to alter or amend.

On the same morning, February 19, 2010, the trial court conducted a hearing on Father's motion to alter or amend. After hearing oral argument from counsel for the parties,[21] the trial court denied the motion to alter or amend but emphasized that the parties' parenting plan should be modified to increase Father's parenting time from the parenting schedule in the 2006 PPP.[22] The trial court added that, pending further orders of the court, Mother was not

---

[21]While the GAL did not argue the motion, she clarified to the trial court her opinion that it was Mother, and not Father, who continued to speak to Katelyn about the ongoing litigation. She informed the trial court that Katelyn was "extremely upset about any change occurring in her life," and was upset about the prospect of again living primarily with Mother.

[22]The trial court was not persuaded by the argument of Father's counsel that Katelyn's schedule at Mother's house was unduly burdensome. The trial court commented:

> She's having to get up early, I understand that and I really wish her mother could get a different job with different hours, but there is probably tens of thousands of single mothers in this city who get up at 4:30, 5:00 in the morning to go to work and they have to make arrangements with their children because of that.
>     Am I really supposed to change the custodial arrangement because she has to go to work early?

to have brother Kagen babysit Katelyn. On February 22, 2010, Father filed a motion for a stay of the judgment pending appeal; that motion was denied.

On March 22 and 25, 2010, the trial court conducted non-evidentiary hearings in which the trial court discussed with the attorneys the details on the modified plan to be adopted in accordance with the trial court's January 28, 2010 ruling. The end result was a modified parenting plan under which Mother is the primary residential parent and, generally, Father would have parenting time every other week from Thursday after school to Monday at 5:30 p.m., plus on alternating weeks, from Wednesday after school to Thursday at 7:00 p.m. It also included the following day-to-day schedule:

> If Mother has to work on a school day when she has scheduled parenting time and is unable to take the child to school in the morning, Father or [Stepmother] shall pick up the child at 5:30 a.m. at Mother's residence. Father or [Stepmother] shall be responsible for dropping the child off at school in a timely manner. . . . Pursuant to Mother's current work schedule, Father is responsible for picking up the child from Mother's residence and transporting the child to school during Mother's parenting time on Wednesdays and Thursdays, as well as all other times when Mother is unable to take the child to school during her parenting time. If the minor child does not spend the night with Father on Sunday night, Father shall also pick the child up on Monday at 5:30 a.m.
>
> If Mother has to work on a school day when she has scheduled parenting time and is unable to pick the child up after school, Father or [Stepmother] will pick the child up after school and keep the child until 5:30 p.m. when Mother will pick the child up from Father's residence. Pursuant to Mother's current work schedule, Father shall pick the child up from school on Mother's parenting days on Mondays, Wednesdays and Thursdays, and at all other times that Mother is unable to pick the child up from school during her parenting time.
>
> If Mother is working on a Sunday when she has scheduled weekend parenting time, Mother shall drop off the minor child at Father's residence Sunday morning before she goes to work and Father shall keep the child until Monday morning when Father or [Stepmother] shall drop the child off at school in a timely manner. Father or [Stepmother] shall pick up the minor child from school Monday afternoon and Mother shall pick up the child from Father's residence that day at 5:30 p.m. If Mother is not working on a Sunday when she has scheduled weekend parenting time, Mother shall keep the child overnight Sunday night.

Thus, in general, on days that Mother worked, Father or Stepmother was to pick up Katelyn from Mother's home at 5:30 a.m., get her ready for school, transport her to school, pick Katelyn up from school, and keep Katelyn at Father's home until Mother gets off work. On Sundays that Mother works, Mother would drop Katelyn at Father's home at 5:30 a.m., where she would stay until Mother got off work. During the summer, the parties were generally to have equal parenting time, with provisions for vacation and visits with out-of-town relatives. In addition, the plan stated, "If Mother is working on a day when she has scheduled summer parenting time, Mother will drop the minor child off at Father's residence before she goes to work and Mother will pick up the minor child at Father's residence on said day at 5:30 p.m."

In the course of the discussion with the attorneys, the trial judge asked Father's counsel whether Father, and, in particular, Stepmother when Father was at his job as a pilot, were willing "to get up at 5:00 in the morning when she [Stepmother] has a young child" and then Stepmother later go on to her job. Father's counsel responded that Father and Stepmother were "perfectly willing and want[] to care for Katelyn in the mornings and after school to make sure that she is adequately prepared for school and that the same problems that occurred prior to this entire litigation occurring don't occur again," and that, "I don't think that it's a matter of what they want, I think it's a matter of what they're willing to do to protect the child."

The modified parenting plan provided that Katelyn would stay at Crosswind Elementary, prohibited Mother from overnight unrelated guests during her parenting time, and prohibited leaving Katelyn in the care of a minor child such as Kagen. The new plan went into effect on March 29, 2010.

On May 7, 2010, the trial court entered a written order memorializing its oral rulings. In the order, the trial court formally denied Father's original petition for injunctive relief and for modification of the 2006 PPP. The court explained:

> From all of which it appears to the Court that Father has failed to demonstrate a material change of circumstances pursuant to Tennessee Code Annotated § 36-6-101(a)(2)(B) to warrant modification of the parties' November 22, 2006 Permanent Parenting Plan to designate Father as the primary residential parent of the parties' minor child, Katelyn Alexis Wall. Therefore, Father's request for the Court to modify the parties' November 22, 2006 Permanent Parenting Plan to designate Father as the primary residential parent shall be and is hereby denied. While the evidence introduced at the hearing did not demonstrate the existence of a material change of circumstances to warrant Father being designated as the primary residential

-23-

parent, the Court finds that there has been a sufficient material change of circumstances pursuant to Tennessee Code Annotated § 36-6-101(a)(2)(C) to warrant modification of the residential parenting schedules contained in the parties' November 22, 2006 Permanent Parenting Plan. In light of the foregoing, the previous parenting orders in this cause shall be and are hereby modified by and through the "Modified Permanent Parenting Plan" which is being entered contemporaneously with this Order.

For child support purposes, Mother was deemed to have 199 parenting days and Father 166 parenting days.[23] Father was ordered to pay Mother $815 per month in child support in accordance with the child support guidelines. The modified parenting plan was filed with the May 7, 2010 order.

On May 11, 2010, counsel for Mother filed a motion to withdraw from his representation of her. The motion was granted on May 22, 2010.

After entry of the trial court's order, Mother notified Father that she intended to send Katelyn to spend three weeks in Florida with her sister. Upon being told of this plan, Katelyn apparently expressed considerable apprehension to Dr. Clement,[24] so Father filed a petition to enjoin Mother from sending Katelyn to Florida. In particular, Father's objections focused on persons who would be caring for Katelyn when Mother's sister was at work during the three weeks, as well as persons who were staying at the sister's home.

On May 27, 2010, the trial court held a hearing on Father's request for injunctive relief. Father's counsel appeared at the hearing. Mother appeared as well and explained that her sister's fiance's adult sons, ages 21 and 24, lived in the sister's home as "a temporary arrangement." Mother assured the trial court that eight-year-old Katelyn had "been nothing but happy whenever we talk about [the Florida trip] at my house" and that the sister "is not

---

[23]Father's parenting days for child support purposes did not include the parenting time before and after school or during the summer, unless it included an overnight stay.

[24]Over three sessions, Dr. Clement said in a letter, Katelyn had expressed concerns about being left at her aunt's home in Florida. The last time she stayed at her aunt's home in Florida, she said, she was watched by the aunt's minor son, the aunt's boyfriend, or Kagen, and "they had a big party and in the morning there were people I didn't know asleep on the floor." Katelyn also told Dr. Clement that Mother did not keep enough food at her home, did not do homework with her, let Katelyn stay up late unless Mother's boyfriend was there, and "has her friend over and I sleep in my bed and then Mom wakes me up and puts me in bed with her." Dr. Clement said that Katelyn was concerned Mother would be angry at her for saying she did not want to go to Florida or what happens in Mother's home. It attached a letter from Katelyn.

a heavy partyer." The trial judge decided to speak directly to Katelyn about her concerns, so Katelyn was brought to the courthouse and met with the trial judge in chambers.

In chambers, Katelyn told the trial court that her aunt would have to work while she was scheduled to be in Florida at her house, and she explained why she wrote the letter[25] indicating that she did not want to go on the Florida trip:

> KATELYN: . . . I don't feel so safe around, like, Jonathan.
>
> THE COURT: Who is Jonathan?
>
> KATELYN: Well, . . . it's my cousin that's . . . 21 years old, and so I just don't really feel safe around him. He smokes. He drinks.
>
> THE COURT: Oh, really?
>
> KATELYN: Uh-huh. [affirmative] He has lots and lots of tattoos on him.

Katelyn expected Jonathan to be watching her "lots of the time" while her aunt was at work. Asked what kind of relationship she had with Jonathan, Katelyn replied, "Not the best one . . . I don't feel safe around him." The trial judge asked Katelyn about her conversations with Mother regarding the Florida trip:

> THE COURT: . . . When your mom talks to you about going to Florida, what do you ---- what do you tell her?
>
> KATELYN: Well, I just don't want to really hurt her feelings because I know that she gets really mad if – sometimes if – sometimes if she doesn't really have her way as she at least wants – wants it.

The trial judge asked Katelyn how things were going since she had moved back in with Mother:

> KATELYN: . . . I liked it like in the beginning of the year – the beginning of the year.

---

[25] The letter was written by Katelyn during her therapy session with Dr. Clement. It said that Mother's family fed her foods which she was not supposed to eat (she is allergic to milk), indicated unease about who would look after her while her aunt was at work, and stated that "I don't feel safe when I'm around Jonathan."

THE COURT: What about the beginning of the year?

KATELYN: Well, at the beginning of the year -- of the school year actually, it -- I liked it because when I was with Dad, I felt like I was spending more time with him. Mom didn't spend time with me when I was with her.

Katelyn said that remained the situation "[e]ven now," that Mother would mostly "watch TV" with she and Kagen, and said that the situation with Mother was "[s]till not good." As the trial judge started to wrap up the in-chambers discussion, Katelyn interjected:

KATELYN: I have one more question. Why didn't you listen to me at the beginning when – that time?
                                    * * *
THE COURT: What did you want to tell me that I didn't know already?
                                    * * *
KATELYN: . . . I was just asking really when – you know, like I told Dr. Clement, I told [the GAL] that Mom wasn't really like the best parent . . . .

Katelyn said she missed Father if she was away from him too much. The trial judge asked Katelyn if she missed Mother as well, and she replied, "I miss her too, but sometimes I don't feel like the safest around her."

The trial judge then dismissed Katelyn, and met again with Father's counsel and Mother. The trial judge informed Mother that Katelyn did not feel comfortable with the sister's fiance's adult sons, but did not want to upset Mother, and admonished Mother, "I think you really have got to listen to [Katelyn] and not really pressure her to take a position." Mother protested that she didn't understand the problem, and the trial court said, ". . . I frankly don't think from what you've told me about that situation – I wouldn't send my eight year old daughter there. I mean, you don't really even know these people frankly." When he told Mother that he was going to enjoin her from sending Katelyn to Florida, Mother protested that she trusted her sister completely, and Katelyn's concerns were instigated by Father. The trial judge then told Mother that his judgment would be the same regardless of what Katelyn said, because it was not "a healthy situation."

Mother then implored the trial judge to reconsider, continued to ask why he would not allow the trip,[26] and protested that the trial court's ruling was "completely unfair" in light of

---

[26]The trial judge patiently explained to Mother, "I don't think it's a safe environment. Your daughter doesn't think it's a safe environment. She doesn't want to go, and I'm not going to force her to go . . . . [T]here are

(continued...)

Katelyn's planned trip to Alaska to visit her paternal grandmother. The trial court ultimately permitted Mother to take Katelyn to Florida only when Mother could be with her.

Father now appeals the trial court's denial of his petition to modify the parenting plan to designate him as Katelyn's primary residential parent.[27]

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Father raises several issues for review:

> 1. Did the trial court err in conducting a trial on all issues after entry of the court's permanent parenting plan order entered on August 5, 2009?
>
> 2. Did the trial court err in the application of 36-6-101(a)(2)(B) in finding that no material change had occurred since the entry of the original agreement of the parties to warrant a modification of the primary residential parent from Mother to Father pursuant to T.C.A. § 36-6-101(a)(2)(B)?
>
> 3. Did the trial court err in finding that the prior modification of the primary residential parent from Mother to Father which occurred in June 2009 and again in August 2009 did not constitute a material change in circumstance in and of itself necessitating a best interest analysis?
>
> 4. Did the trial court err by applying T.C.A. § 36-6-101(a)(2)(C) to petition requesting modification of the primary residential parent not a modification of the parenting schedule?
>
> 5. Did the trial court err in entering a Modified Permanent Parenting Plan Order pursuant to T.C.A. § 36-6-101(a)(2)(C) which modifies provisions of the parties' original agreement which are not related to the parenting schedule?
>
> 6. Did the trial court err in failing to award the Appellant attorneys' fees and the GAL fees incurred and paid by him in the course of protecting the best interest of the minor child?

---

[26](...continued)
too many . . . things that happen with young girls."

[27]Father filed a premature notice of appeal on February 23, 2010, which this Court deems to be timely pursuant to Rule 4(d) of the Tennessee Rules of Appellate Procedure.

7. Did the trial court err in its application of the Tennessee Child Support Guidelines when calculating and awarding child support both temporarily and in the final order?

The determination of whether a material change in circumstances has occurred, and whether such a change necessitates a change in the parenting arrangement, are both questions of fact for the trier of fact. *See In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). We review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn.1984); Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, findings of fact that are based on witness credibility are given great weight, and they will not be overturned absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In addition, we recognize that "[t]rial courts are vested with wide discretion in matters of child custody" and that "the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993).

Some of the issues raised by Father in this appeal involve questions of law. As to those issues, our standard of review is *de novo* on the record, with no presumption of correctness in the trial court's decision. *Kendrick*, 90 S.W.3d at 569-70; *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

## ANALYSIS

Decisions involving the custody of a child are among the most important decisions faced by the courts. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). When presented with a request to modify a parenting arrangement, the existing arrangement is generally favored, based on the premise that children tend to thrive in a stable environment. *Aaby v. Strange*, 924 S.W.2d 623, 627-28 (Tenn. 1996); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 2001). Thus, there is "a strong presumption in favor of continuity of placement" of a child. *Aaby*, 924 S.W.2d at 627 (quoting *Taylor v. Taylor*, 849 S.W.2d 319, 332 (Tenn. 1993)); *see also* T.C.A. § 36-6-106(a)(3) (listing continuity as a factor in custody decisions). An existing order establishing a parenting arrangement is considered *res judicata* on the facts as they existed at the time the order was entered. *Steen*, 61 S.W.3d at 327. However, courts are statutorily authorized to modify parenting arrangements as necessitated by intervening changes in circumstances, in the best interest of the child. *Conner v. Conner*, No. W2007-01711-COA-R3-CV, 2008 WL 2219255, at *2 (Tenn. Ct. App. May 29, 2008).

## Effect of August 5, 2009 Permanent Parenting Plan

We first address Father's argument that the trial court's order and permanent parenting plan entered on August 5, 2009, was a final adjudication of his petition to modify, and so the trial court erred in subsequently allowing Mother to relitigate all of the issues, including the designation of primary residential parent. Father claims that the only issues remaining for the trial court's decision after that order was entered were the award of attorney fees, if any, the apportionment of the GAL fees, and the trial court's final calculation of child support prior to October 1, 2009. He argues that the trial court violated the principle of *res judicata* by permitting Mother to retry the issue of modification absent *her* showing a material change in circumstances since the August 5, 2009 order, and that this constitutes reversible error.

In its August 5, 2010 order, the trial court did, indeed, adopt the parenting plan filed by Father and the GAL. However, the order stated specifically that the parenting plan filed with the order was adopted "pending the trial of this matter which shall occur within sixty (60) days from the date of entry of this Order," and a trial date was set for October 7, 2009. The order does not limit the issues to be considered in the scheduled trial; it indicates only that Mother would be given an opportunity to obtain substitute counsel.

When an order relating to a parenting arrangement is made temporary on its face, the order is not a final order. Therefore, the issues addressed in the order remain in the bosom of the trial court, and any rulings in the order may be modified at any time before a final order is entered. *See Greer v. Greer*, No. W2009-01587-COA-R3-CV, 2010 WL 3852321, at *6 n.7 (Tenn. Ct. App. Sept. 30, 2010). In a similar situation, this Court has explained:

> The law makes a distinction between temporary and final orders of custody. "An interim order is one that adjudicates an issue preliminarily; while a final order fully and completely defines the parties' rights with regard to the issue, leaving nothing else for the trial court to do." *State, ex rel., McAllister v. Goode*, 968 S.W.2d 834, 840 (Tenn. Ct. App. 1997) (citing *Vineyard v. Vineyard*, 170 S.W.2d 917, 920 (Tenn.1942)). Trial courts have discretion to grant temporary custody arrangements in circumstances "where the trial court does not have sufficient information to make a permanent custody decision or where the health, safety, or welfare of the child or children are imperiled." *King v. King*, No. 01A01-91-10PB00370, 1992 WL 301303, at *2 (Tenn. Ct. App. Oct. 23, 1992).
> . . . . Because the order granting Mr. Warren custody was only temporary, Ms. Warren did not have to show a material change in circumstances at the July 28, 1999 hearing in order to have custody of [the child].

*Warren v. Warren*, No. W1999-02108-COA-R3-CV, 2001 WL 277965, at *4 (Tenn. Ct. App. Mar. 12, 2001). Here, the August 5, 2010 order designating Father as the primary residential parent was temporary, not final. Therefore, Mother did not have to show a material change in circumstances from August 5, 2010, to again be designated Katelyn's primary residential parent. *See id.* Accordingly, the burden remained on Father to establish a material change in circumstances since the original divorce decree warranting a change in the designation of primary residential parent.

### Modified Parenting Plan — T.C.A. § 36-6-101(a)(2)(B) and (C)

#### *Applicable Law*

The next issues raised by Father center on the trial court's refusal to designate him as the permanent primary residential parent. Subsections (B) and (C) to Tennessee Code Annotated § 36-6-101(a)(2) govern the modification of prior orders pertaining to parenting. In 2004, Subsection (C) was added to the statute to apply specifically to modifications in the residential parenting schedule. Subsection (B) was amended to delete reference to modifications to the schedule, leaving it to apply only to modifications pertaining to custody, *i.e.*, changing the designation of the primary residential parent. This Court has explained that the effect of the 2004 amendment was to create a lower threshold for establishing a material change in circumstances sufficient to warrant modification of the parenting schedule, but leave unchanged the criteria for changing the designation of primary residential parent:

> As a result of the 2004 amendment, Tennessee now has a different set of criteria for determining whether a material change of circumstance has occurred to justify a modification of a "residential parenting schedule" and the specifics of such a schedule. The amendment, specifically the addition of subsection (a)(2)(C), establishes different criteria and a lower threshold for modification of a residential parenting schedule. However, the statutory criteria pertaining to a modification of "custody"—the term used in the statute, which we equate to the designation of "primary residential parent" and matters more substantive than a change of schedule—remain unchanged.

*Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citations omitted)).

Subsection (B), which applies specifically to changes in the designation of the primary residential parent, states:

-30-

> If the issue before the court is a modification of the court's prior decree *pertaining to custody*, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change in circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

T.C.A. § 36-6-101(a)(2)(B) (2010) (emphasis added). Subsection (C), pertaining to residential parenting schedules, states:

> If the issue before the court is a modification of the court's prior decree pertaining to a *residential parenting schedule*, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

T.C.A. § 36-6-101(a)(2)(C) (emphasis added). "[T]he determination of whether a 'material change of circumstances' has occurred requires a different standard depending upon whether a parent is seeking to modify custody (*i.e.*, change the primary residential parent) or modify the residential parenting schedule." *In re Zachary G.G.*, No. M2010-00095-COA-R3-JV, 2010 WL 3515673, at *5 (Tenn. Ct. App. Sept. 8, 2010); *see also Schreur v. Garner*, No. M2010-00369-COA-R3-CV, 2011 WL 2464180, at *4-5 (Tenn. Ct. App. June 20, 2011).

"We recognize that the circumstances of children and their parents inevitably change — children grow older, their needs change, one or both parties remarry. But not all changes in the circumstances of the parties and the child warrant a change in custody." *Cosner v. Cosner*, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *4 (Tenn. Ct. App. Aug. 22, 2008). "There are no hard and fast rules for when there has been a change of circumstances sufficient to justify a change in custody." *Id.* (citing *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003)). The following factors, however, are relevant: (1) whether the change occurred after entry of the order to be modified; (2) whether the change was known or

"reasonably anticipated" when the previous order was entered; and (3) whether the change "affects the child's well-being in a meaningful way." *Kendrick*, 90 S.W.3d at 570 (quoting *Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn. 2002)). "[A] parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well being." *Id.*

The analysis under either (B) or (C) is a two-step process. First, the parent who seeks to modify the existing parenting arrangement has the burden of proving the requisite material change in circumstances. *Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *3 (Tenn. Ct. App. Aug. 5, 2008) (citing *Kendrick*, 90 S.W.3d at 570). If a material change in circumstances has occurred, the trial court then must consider whether a change in the designation of primary residential parent, or of the parenting schedule as the case may be, is in the child's best interest, considering the factors in Tennessee Code Annotated § 36-6-106(a). *See Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007).

### Father's Arguments on Appeal

Father makes several arguments in his challenge to the trial court's decision to deny his petition for modification. He first argues that the trial court erroneously determined that the material change in circumstances that had occurred since the 2006 PPP was insufficient to designate him as the permanent primary residential parent. He asserts: "[I]t is an impossibility to find that a material change has not occurred under section (B) but that a material change has occurred under section (C)." Father also argues that it is an error of law for the trial court to apply subsection (C), rather than subsection (B), because the only relief requested in his petition for modification was a change of the primary residential parent, not a modification of the parenting schedule.

In addition, Father argues that the positive change in circumstances that resulted from the seven or eight months during which Katelyn lived with him from June 2009 until trial in January 2010, in and of themselves, constituted a material change in circumstances which warranted designating him as the primary residential parent for Katelyn. He claims that the evidence at trial showed that, after Katelyn began living with him, she became a healthy, happy, academically successful child, as confirmed by the testimony of the GAL and Dr. Clement. Father insists that these positive changes were ignored by the trial court and should have weighed in favor of designating him as Katelyn's primary residential parent.

Father argues further that the trial court erred in modifying several provisions of the 2006 PPP that were unrelated to the parenting schedule, such as summer visitation and elementary school designation. He argues that "[t]he trial court contradicted itself and misapplied the

-32-

law" in modifying the parenting schedule under subsection (C), and then in going far beyond the scope of that section which applies to simply modifying the parenting schedule.

Finally, Father asserts that the trial court erred in determining how many parenting days were ultimately credited to each party in the Modified PPP.[28]  He claims that the practical effect of the trial court's order is to actually give him more parenting days than Mother, making him the *de facto* primary residential parent.  He argues that the trial court should be required to change the permanent parenting plan to reflect the reality that he has more parenting days than Mother and is in effect the primary residential parent.  He contends that his child support payments should reflect this reality as well.  For these reasons, Father argues, the trial court's decision should be reversed.

Mother filed a *pro se* brief, arguing that the trial court's decision should be affirmed.  She includes extensive excerpts from pleadings filed by her trial counsel, included in the appellate record, which argue that the trial court was justified in declining to designate Father as the primary residential parent in this case.

### *Denial of Petition to Modify the Primary Residential Parent*

The trial court held that a material change in circumstances had occurred since the entry of the 2006 PPP.  This finding has not been appealed, and this is not in dispute on appeal.  The trial court further held that the material change in circumstances was not sufficient to change the primary parent designation from Mother to Father under subsection (B), but that the change in circumstances was sufficient "to warrant modification of the residential parenting schedules" under subsection (C).  This is disputed by Father on appeal.

Father contends that, because his petition sought a change in the designation of primary residential parent, not a modification of the schedule, the trial court was without authority to simply change the schedule.  We respectfully disagree.  Father points to no authority which precludes the trial court from determining from the proof that, while the movant established a material change in circumstances, it warranted only the relief in subsection (C) of section 36-6-101(a)(2), *i.e.*, a modification of the parenting schedule.  We find this argument is without merit.

We agree with Father that the events that occurred during the pendency of the litigation must be considered in determining whether a change in circumstances has occurred sufficient to change either a primary parent designation or a parenting schedule.  "[E]vents and lives have

---

[28]This argument was made in connection with Father's challenge to the trial court's child support award. In our view, it is pertinent to the propriety of the trial court's ultimate decision as well.

not stood still while this custody dispute has been in the courts." ***Gorski v. Ragains***, No. 01A01-9710-GS-00597, 1999 WL 511451, at \*4 (Tenn. Ct. App. July 21, 1999); ***see also Hawkins v. O'Brien***, M2008-02289-COA-R3-CV, 2009 WL 2058802, at \*6 (Tenn. Ct. App. July 15, 2009).  However, we agree with the trial court's holding, that Father's status as the temporary primary residential parent was not of such duration so as to essentially become a new *status quo* that essentially mandated a modification of his primary residential parent status permanently.  Therefore, we respectfully disagree with Father's argument that the trial court ignored the positive changes while he was primary residential parent, or that the trial court was in essence required to permanently designate him as the primary residential parent.

Here, while the trial court found a material change in circumstances, it in effect held that Father had not carried his burden in the second part of the two-step process in section 36-6-101(a)(2), that he failed to show that a change in the designation of the primary residential parent was in Katelyn's best interest.  The trial court found only that an increase in Father's parenting time was in the child's best interest.  Therefore, we consider whether the evidence preponderates in favor of the trial court's factual finding that permanently designating Father as the primary residential parent was not in Katelyn's best interest.  ***See In re T.C.D.***, 261 S.W.3d at 746.

Whether modification of a residential parenting plan is in the child's best interest requires consideration of a number of factors,[29] including those in set out in Section 36-6-106(a).[30]

_____

[29]We note that, in 2011, T.C.A. § 36-6-106(a) was amended to add the following:

> In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out below, the location of the residences of the parents, the child's need for stability, and all other relevant factors.

2011 Tenn. Laws Pub. Ch. 433 (H.B.571).

[30]Section 36-6-106(a) enumerates these non-exclusive factors:

> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;
> (2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or

(continued...)

-34-

A decision regarding the child's best interest should be designed to "promote children's best interests by placing them in an environment that will best serve their physical and emotional needs." *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983). Parenting decisions should not be intended or designed "to reward parents for prior virtuous conduct, nor to punish them for their human frailties or past missteps." *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006); *see also Kesterson v. Varner*, 172 S.W.3d 556, 561 (Tenn. Ct. App. 2005). Always, the best interest of the child is paramount.

In this case, the trial court did not specifically delineate the factors relied upon in its decision to modify the parenting schedule rather than make permanent Father's designation as primary residential parent, stating only that permanently designating Father as the primary residential

---

[30](...continued)

caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

T.C.A. § 36-6-106(a) (2010).

parent was "too drastic a measure to take."[31]  We must examine, however, the parenting schedule implemented by the trial court.

First, while we do not address the determination of the number of "days" for each parent for purposes of calculating child support, Father correctly points out that the overall parenting time allocated to Father, including his parenting time caring for Katelyn while Mother is at work, equals or surpasses the parenting time for Mother.  Under the circumstances of this case, we cannot go so far as to agree with Father's assertion that he is the "*de facto*" primary residential parent regardless of the formal designation.  Here, the record shows that, once the trial judge informed the parties that Mother would be the primary residential parent, Father asked the trial court to permit he and Stepmother to care for Katelyn while Mother was at work, largely out of concern about Mother's past child care arrangements.  We note overall, however, that the trial court felt that the circumstances justified such a substantial allocation of parenting time to Father.

We must observe that the day-to-day parenting schedule implemented by the trial court is remarkable in its complexity, driven in part by Mother's early-morning work schedule.  We agree with an early concern of Dr. Clement, that Katelyn was "in dire need of continuity in her day to day life and should not be caused to go back and forth between Mother and Father's house multiple times every week in order to accommodate Mother's work schedule."  This is a significant factor to be considered.

We also agree with the trial court's observation that thousands of single parents who are good parents work in jobs with similar hours, necessitating child-care arrangements for early-morning hours.  Children of divorce are not immune from the need to accommodate a parent's job, and clearly Mother tried to find other work, such as real estate, that would better fit child-rearing.  To be sure, the fact that the custodial parent has an atypical work schedule,

---

[31] Rule 52.01 of the Tennessee Rules of Civil Procedure, titled "Findings Required," requires trial courts to issue findings of fact and conclusions of law in all actions tried upon the facts without a jury.  Tenn. R. Civ. P. 52.01.  In some cases, a trial court's failure to issue the required factual findings and conclusions of law is a basis for vacating and remanding the trial court's decision.  *See, e.g., Clement Homes, Inc. v. Chilcutt*, No. W2009-02277-COA-R3-CV, 2010 WL 2812574, at *2 (Tenn. Ct. App. July 16, 2010).  In this case, the trial court's written order does not make credibility determinations, nor does it state the particular evidence on which it relied in concluding that a material change in circumstances existed.  The better practice in this type of case, where the parties' credibility factors greatly in the trial court's decision, is for the trial court to resolve issues of credibility and to describe the evidence on which it relies in its written findings of fact.  In this case, however, the facts upon which Father relied in support of his petition were either undisputed or they were supported by a preponderance of the evidence at trial.  Therefore, we do not find it necessary to vacate the trial court's decision based on its failure to comply with Rule 52.01.  *See Webb v. Pewitt*, No. W2010-01715-COA–R3-CV, 2011 WL 1631816, at *6 (Tenn. Ct. App. Apr. 28, 2011)

in and of itself, should not necessitate a change in the designation of primary residential parent, if the other factors do not weigh in favor of such a change.

However, the burden on the child of such a  parenting schedule is no small matter.  A parenting schedule that requires the child to shuttle frequently between households, whether implemented to accommodate parental work schedules or in order to neatly divide the child's time between the parents, is most onerous for the child who bears the brunt of the parents' divorce.  The child must be ever mindful to have with her necessary school books, supplies, clothing, or even toys or sports equipment, and must be vigilant to be ready to gather her belongings at the appointed time for transportation to the other parent's house.  Even mundane things such as making a play date with a friend or scheduling an after-school activity require the child to ascertain in which parent's home she will be or who is picking her up and when.  All children must tolerate some of these considerations, and a child of divorced parents must necessarily have a more complicated schedule than children from intact homes, if the child is to have a meaningful relationship with both parents.  But a schedule that mandates such frequent back-and-forth, whether to accommodate a parent's work schedule or not, gives the child little opportunity to have a sense of belonging, and time to simply be home becomes a luxury.

Thus, while virtually all divorced parents must work outside the home, and some parents must work atypical hours, it is not punishment to the parent to consider the effect of her work schedule on the child.  Rather, it is the court's job to ensure that the everyday quality of the child's life is not sacrificed to meet the parents' needs or desires.  Consideration of how "child-friendly" each parent's schedule must necessarily be part of that determination.  "[T]he child's best interest in the paramount consideration.  It is the polestar, the *alpha and omega*."  ***Bah v. Bah***, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983) (emphasis in original).  In this case, it is not unfair to Mother to consider the effect of her work schedule on Katelyn; rather, it is unfair to Katelyn not to consider it.

Nevertheless, if the burdensome parenting schedule resulting from Mother's work were the only problem, we would be loathe to find that the trial court's decision was contrary to the preponderance of the evidence or an abuse of the trial court's discretion.  It is not the only problem.  The trial court below expressed concern about Mother, observing that she was not "sufficiently engaged and focused" on Katelyn's best interest.  The evidence fully supports this finding.  Indeed, the evidence shows clearly that Mother consistently exercised poor judgment and prioritized her own needs and desires above those of her child.

The undisputed evidence showed that Mother consistently left six-year-old Katelyn alone in the care of eleven-year-old Kagen for long periods of time while she was at work.  She ostensibly relied on neighbor Carrie, who was in a nearby apartment and available "if

needed," though sometimes asleep. For reasons never fully explained, Mother refused Father's offer to provide child care, and even cursed him for asking about her child care arrangements and the identity of the caregiver for their child. Even after Mother's practice of leaving Katelyn in the care of Kagen came to light, she continued it and even defended it, undeterred by the jeopardy to Katelyn from a sudden emergency or circumstance beyond the ability of an eleven-year-old to handle. While Kagen is not the subject of this litigation, the fact that Mother would consistently place such an adult burden on him also shows poor judgment as a parent. The record shows that Mother's practice of leaving Katelyn in Kagen's care continued even after the trial court explicitly prohibited it, and that it was curtailed only when Father and Stepmother were permitted to pick up Katelyn in the mornings when Mother left for work.

Mother's judgment on after-school child care arrangements showed a similar lack of judgment. Although Mother's testimony sought to cast the arrangements in a favorable light, the evidence is undisputed that, as described by the GAL, on a daily basis, six-year-old Katelyn was deposited by the school bus at the bus stop, alone, and left to walk to Carrie's apartment, or Melissa's apartment, or the apartment of another available adult caregiver to take charge of her. Again, this practice ended only when Father and Stepmother were permitted to pick up Katelyn after school and care for her until Mother's work shift ended.

The undisputed evidence shows that Mother repeatedly either had male friends spend the night in her apartment, or she brought the children with her to the home of a male friend and "ended up" staying most or all of the night. Despite the fact that the GAL explicitly told Mother that this practice was not acceptable, it reoccurred at least once, shortly before the hearing on Father's petition.

The testimony of both the GAL and Dr. Clement, incorporating information from multiple teachers, indicates that Mother's care of Katelyn was inattentive, with little heed paid to communications from teachers, school assignments, appointments with the psychologist, even clothing and hygiene. Mother's testimony sought to depict such statements from teachers, the psychologist, or the GAL as uninformed, mistaken, untrue, or even "crazy." The trial court did not make an explicit credibility determination on these points, but its finding that Mother was not sufficiently engaged or focused on the best interests of Katelyn suggests that Mother's attempt to explain away the observations of the GAL, Dr. Clement, and the teachers was not credited. The deleterious effect of Mother's failure to attend to Katelyn's needs was alleviated by Father as he was given more parenting time.

In contrast, whatever the parties' relationship during the marriage, the evidence in the record shows Father's consistent focus on Katelyn's best interest after the parties' divorce. Apparently, soon after the divorce, Father assumed or was led to believe that Katelyn was

doing well. Once Father learned that Katelyn was having difficulties, he clearly stepped into the breach. He intervened to support Katelyn academically, was cooperative in the face of Mother's tirades and defensiveness, and he and Stepmother demonstrated the ability to provide Katelyn a stable, nurturing home. Although the time in which Father was the temporary primary residential parent, as noted above, did not create a new "*status quo*," the positive changes in Katelyn's life resulting from Father's efforts must be accorded appropriate weight. All of the evidence showed that Katelyn was more happy, secure, and self-confident while Father was the temporary primary residential parent. Indeed, the proof showed that, while Father was the temporary primary residential parent, Katelyn's overall sense of well-being was disturbed primarily by incidents that occurred during Mother's parenting time. In addition, even after the trial court rejected Father's petition to be designated the permanent primary residential parent, Father, and Stepmother, demonstrated continued focus on Katelyn's best interest by asking to be permitted to care for Katelyn while Mother was at work, in the very early morning when necessary, to protect Katelyn from Mother's continued poor choices in child care.

The difference in the parties' financial resources does not affect the Court's evaluation of Katelyn's best interest.[32] As noted by the trial court, countless single parents with limited income face such challenges. These parents nevertheless manage to make wise parenting choices to keep their children safe. Mother consistently made poor choices, and even refused Father's offers to provide appropriate child care to accommodate Mother's work schedule.

In this case, it is undisputed that Mother was Katelyn's primary caregiver from birth until Father was designated as the temporary primary residential parent. The governing statute expressly lists, as factors to be considered, "the degree to which a parent . . . has been the primary caregiver" and the "importance of continuity in the child's life." T.C.A. § 36-6-106-(a)(2) and (3). These are powerful considerations in any custody dispute, as demonstrated by the trial court's rightful reluctance to take the "drastic measure" of changing the designation of primary residential parent. The evidence in the record, however, shows that continuity in this case does not equal stability, because Mother has not provided Katelyn a "stable, satisfactory environment." T.C.A. § 36-6-106(a)(3). From the evidence in this record, it appears that remaining in Mother's care makes Katelyn feel less safe, not more safe.

Considering the record as a whole, we must conclude that the preponderance of the evidence establishes that it is in Katelyn's best interest to designate Father as Katelyn's primary residential parent. We remand the cause to the trial court for implementation of a parenting

---

[32] Although there is significant disparity in the parties' income, the terms of the divorce, including spousal support, were agreed to by the parties, and were not appealed.

plan consistent with this holding. On remand, in restructuring the parties' parenting arrangement, the trial court, of course, may consider other circumstances that have occurred during the pendency of this appeal.

## Attorney Fees

Father argues that the trial court erred in failing to award him his attorney fees and GAL fees incurred and paid by him in the course of protecting the best interest of Katelyn. In light of our finding that the trial court erred in declining to grant Father's petition for modification, we remand this issue to the trial court for reconsideration.

## Temporary Child Support[33]

Finally, Father argues that the trial court erred in requiring him to continue to pay Mother $750 per month in temporary child support after September 2009.[34] He claims that the trial court erred in failing to issue written findings of fact stating with specificity why it deviated upward from the guidelines by $955 in ordering him to pay Mother $750 per month in child support, when a straight application of the guidelines would have required *Mother* to pay *Father* $205 per month. He also argues that the trial court erred in failing to determine and enter a written finding on the presumptive amount of child support that would have been due from Mother under the child support guidelines. Such a calculation, Father argues, should have taken into consideration his other child, born on October 7, 2009.

The child support guidelines must be followed in every action "to establish, modify, or enforce child support, whether temporary or permanent." Tenn. Comp. R. & Regs 1240-02-04-.01(2)(a). The presumptive amount of child support due under the guidelines may be rebutted, and a trial court may, in its discretion, deviate from the amount of support recommended in the child support guidelines if such a deviation is warranted. *See Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005) (citing *State v. Wilson*, 132 S.W.3d 340, 343 (Tenn. 2004); *Jones v. Jones*, 930 S.W.2d 541, 545 (Tenn.1996)). If the trial court chooses to deviate from the guidelines, it "must make specific written findings regarding how the application of the Child Support Guidelines would be unjust or inappropriate in the case." *Id.*; *see* T.C.A. § 36-5-101(e)(1)(A) (2010); Tenn. Comp. R. &

---

[33] Father also challenged the award of child support made to Mother under the Modified PPP. In light of our reversal of the trial court's denial of Father's petition for modification, we remand this issue for reconsideration by the trial court.

[34] As we interpret Father's argument in his appellate brief, Father does not challenge the initial temporary custody award included in the August 5, 2009 parenting arrangement. Rather, he challenges only the continuation of that support beyond October 1, 2009.

Regs. 1240-02-04-.07(1)(b). Because deviations from the child support guidelines are discretionary, we review the trial court's decision to deviate upward for an abuse of discretion. *Richardson*, 189 S.W.3d at 725. An abuse of discretion occurs when the trial court deviates from the statutes or guidelines without an adequate evidentiary foundation. *State ex rel. Anderson v. Taylor*, No. M2001-02193-COA-R3-CV, 2003 WL 21480087, at *4 (Tenn. Ct. App. June 27, 2003).

In this appeal, we must determine whether the trial court abused its discretion in deviating upward from the guidelines in ordering Father to pay Mother $750 per month from October 1, 2009, through the January 2010 trial date. The modified parenting plan filed on August 5, 2009, included a provision requiring Father to pay Mother $750 in temporary child support for August and September "to allow Mother time to adjust her finances." The trial court extended this requirement after the hearing on October 6, 2009, and again in January 2010 pending the date of trial. Each extension in temporary child support was necessary, the trial court held, to "maintain the *status quo*" until trial. The trial court's final order on the subject stated that "the grounds supporting the deviation have not materially changed and that it is in [Katelyn's] best interest for Father to continue paying said temporary child support pending the hearing on Father's Emergency Petition."

The trial court stated in writing its finding that the temporary order of support was necessary to maintain the *status quo* pending a final hearing. We agree with Father that child support should not be used to take the place of spousal support. However, it is undisputed that Mother is the economically disadvantaged spouse. Under the original parenting plan, Mother had been receiving $1,100 per month, an upward deviation under the child support guidelines, and she was dependent on the receipt of the child support to maintain her home. The economic hardship from having to suddenly forego child support altogether could have financially devastated Mother, and this in turn would have had a negative impact on Katelyn. Because the child support at issue was designated as temporary, the trial court focused primarily on Mother's need for the temporary support to maintain the *status quo* prior to trial, and Father's ability to make the payments. We agree with the trial court that, at that point, enabling Mother to maintain the *status quo* pending a hearing was in the best interest of Katelyn. Therefore, under the specific circumstances of this case, we find that the trial court did not abuse its discretion in deviating upward from the guidelines on a temporary basis and in ordering Father to pay $750 per month in child support to Mother from October 2009 through January 2010, during the pendency of the hearing on his petition.

CONCLUSION

The decision of the trial court is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with this Opinion. Costs on appeal are to be taxed equally,

one-half to Appellant David Larkin Wall and his surety, and one-half to Appellee Amy Ballesteros Wall, for which execution may issue, if necessary.


_____

HOLLY M. KIRBY, JUDGE